# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PEDRO JUAN FRANCESCHI,

        Plaintiff,

v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Civil Action No. 15-cv-11125-IT

---

**REPORT AND RECOMMENDATION OF PLAINTIFF PEDRO JUAN FRANCESCHI'S
MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER;
AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION
OF THE COMMISSIONER
(Dkt. Nos. 15, 19)**

CABELL, U.S.M.J.:

       Plaintiff Pedro Juan Franceschi ("the plaintiff" or "Franceschi") moves to reverse or remand a final decision by the Commissioner of Social Security ("the Commissioner") denying his application for Supplemental Security Income disability benefits ("SSI"). The Commissioner cross-moves to affirm its decision. (Dkt. Nos. 15, 19). As discussed below, the Administrative Law Judge ("ALJ") appears to have given great weight to the medical opinions of non-treating physicians who only examined an incomplete record. In another instance, the ALJ appears to both credit and reject the same medical opinion evidence. To be sure, the factual record in this case is a lengthy and complicated one and the ALJ unquestionably endeavored to evaluate the plaintiff's application with care. Still, the Court concludes that a remand is appropriate in order to allow the ALJ to either provide additional explanation regarding his reasoning or to reconsider the record with these concerns in mind. It is therefore respectfully recommended that the plaintiff's motion

to reverse or remand be granted, and that the Commissioner's motion to affirm be denied.

## I.  PROCEDURAL HISTORY

The plaintiff suffers from a number of ailments or conditions, including lumbar degenerative disc disease (DDD), right knee degenerative joint disease (DJD), status-post left upper extremity laceration, anxiety, alcohol abuse in reported remission, and hepatitis C.  The plaintiff also has a history of hypertension.  (Dkt. No. 13; Social Security Administration Record of Social Security Proceedings, at page 21) [hereinafter "(R. __)"].  On June 21, 2007, an ALJ determined that the plaintiff was entitled to SSI benefits.  (R. 33-43).  After receiving only one check, however, the plaintiff's benefits were terminated because he went to prison.  He remained in prison until December 1, 2011.  Shortly after his release, on December 19, 2011, the plaintiff filed a new application for SSI benefits under Title XIX of the Social Security Act.  It is this effort to obtain benefits that forms the basis of the instant matter.  (R. 146).

On February 23, 2012, the Social Security Administration (SSA) determined that the plaintiff was not disabled during the relevant period, and therefore was not entitled to SSI benefits. (R. 102).  On July 18, 2012, the SSA affirmed its determination after reconsideration.  (R. 107). The plaintiff requested an administrative hearing and received one before ALJ Henry J. Hogan ("the ALJ"), on September 26, 2013.  (R. 44-81).  On October 18, 2013, the ALJ determined in a written decision that the plaintiff was not disabled, and was therefore ineligible for SSI benefits. (R. 16-28).  On January 13, 2015, the Appeals Council denied the plaintiff's request for a review of the ALJ's decision, making it the final decision of the Commissioner.  (R. 1-3).

The plaintiff then filed this action on March 23, 2015.

## II.   <u>FACTS</u>

### a.   <u>Personal and Employment History</u>

The plaintiff was born on January 20, 1968, and was 36 years old at the time of the alleged onset of his disability in 2004.  (R. 176).  He completed the eleventh grade and went on to complete a certificate course in carpentry.  (R. 48, 181).  The plaintiff's past relevant work was primarily as a carpenter from 1987-1988 and again from 1991-2000.  He also did some temporary work from 2003-2004 and again in 2006.  (R. 181).

### b.   <u>The Plaintiff's Medical Treatment</u>

#### i.   *The Plaintiff Begins Medical Treatment Upon Release From Prison*

The plaintiff has seen several physicians or medical professionals since his release from prison in December of 2011.  On December 14, 2011, he sought treatment at the Family HealthCare Center in Fall River, MA.  Nurse Practitioner Jane Alpert (NP Alpert) noted that the plaintiff had hypertension but was asymptomatic, had high blood pressure, complained of bilateral knee pain and that he could not stand for long periods of time, and complained of an injury to his left arm which prevented him from lifting more than 10 pounds.  She also noted that the plaintiff did not have any unusual anxiety or evidence of depression.  NP Alpert referred the plaintiff for physical therapy but noted that it was unclear whether he would be able to attend because of transportation issues.  She prescribed him medication for his blood pressure and hypertension.  (R. 239-240).

The plaintiff saw NP Alpert again on December 16, 2011.  She noted that he continued to be asymptomatic, although there was minimal improvement to his hypertension despite his new medications.  (R. 242).  NP Alpert referred the plaintiff to the facility's cardiology department and discussed with the plaintiff the need to control his hypertension.  (R. 243).  On January 26, 2012,

the cardiologist, Dr. Jay Schachne, reported the results to NP Alpert and noted that he was adding medications to the plaintiff's regimen.  He also indicated that he was going to order further tests and would see the plaintiff again for a follow-up.  (R. 276).  Dr. Schachne further noted that the plaintiff "has had disability with regard to back injuries" and that his "[e]xtremities are without edema, distal pulses intact." (*Id.*)

### ii.   The State Agency Evaluation and Consultative Examinations

Meanwhile, the SSA began its review of the plaintiff's December 2011 SSI application for disability benefits.  On January 20, 2012, state agency physician Dr. John Jao stated that, due to the lack of medical records, he needed more information in order to determine whether the plaintiff was eligible for benefits.  Dr. Jao ordered medical consultative examinations.  (R. 246).  As a result, on February 2, 2012, Disability Determination Services' (DDS) consultants conducted two consultative examinations (CE) -- one physical and one mental.

Dr. Vladimir Yufit conducted the plaintiff's physical CE.  (R. 247-250).  Dr. Yufit noted that the plaintiff had hepatitis C, chronic lower back pain, pain in both knees, hypertension, hyperlipidemia and depression, but that the plaintiff was not taking any antidepressants and did not see anyone for help.[1] (R. 247-48).  Dr. Yufit generally described the plaintiff as being pleasant, not in distress, and "in a normal mood."  (R. 248).  In examining the plaintiff's back pain, Dr. Yufit noted that the plaintiff had difficulty kneeling and squatting.  The plaintiff could sit for about 20 minutes but would then need to change positions or get up and stretch.  The plaintiff could stand for 45 minutes and could walk for 15 minutes but doing so might hurt his knees.  (R. 247).  The doctor concluded that the "chronic lumbosacral pain" was "probably due to the lumbosacral spondylosis" but that there was "nothing on the physical examination to suggest spinal nerve root

---

[1] In the same report, however, Dr. Yufit listed Prozac as one of the medications the plaintiff was taking at the time. (R. 248).

compression." (R. 249). Dr. Yufit noted that the plaintiff had limitations lifting and reaching above the shoulder level with his left arm. (R. 247). He opined that the plaintiff's left arm laceration seemed "to be lumbosacral" and that the plaintiff had "no normal range of motion in both shoulders and normal strength."[2] (R. 249). Further, an examination of the plaintiff's right knee "revealed no effusion, full range of motion, maybe few clicking on flexion and extension" and his left knee "revealed full range of motion, no effusion." (R. 249). Dr. Yufit opined that the plaintiff "probably [had] mild degenerative joint disease" but that he "ambulated with a normal gait" and had "normal muscle strength." (R. 249). Finally, Dr. Yufit noted that the plaintiff's liver function test revealed "quite abnormal findings" and that an x-ray of the plaintiff's lumbosacral spine was pending. (R. 249).

Dr. Sol Pittenger conducted the plaintiff's mental CE. (R. 255-259). The plaintiff explained to Dr. Pittenger his history of substance abuse and his pattern of depressed and anxious moods. The plaintiff also admitted to casually using alcohol since his release from prison, by having one or two beers on each occasion. (R. 255-56). The plaintiff also described his mood as "low, unmotivated and anxious." The plaintiff said he became anxious in public settings due to his long history of incarceration but was not suicidal and had no history of suicide attempts. (R. 256). Dr. Pittenger noted that the plaintiff's presentation was suggestive of antisocial personality disorder traits. (R. 255). In general, Dr. Pittenger believed that the plaintiff's responses to interview questions were of the "impulsive or cavalier quality," and that the plaintiff approached the evaluation process in "a guarded and superficial manner." (R. 257). With respect to the plaintiff's depression, Dr. Pittenger noted that the plaintiff had recently started taking Prozac, had never been psychiatrically hospitalized, and stated that he felt his depression had developed within

---

[2] It is unclear whether Dr. Yufit's note that the plaintiff had "*no* normal range of motion" was in error, as the context of his comments appear to suggest that he found the plaintiff to have normal range and strength in his shoulders.

the last one or two months of his incarceration "as he was preparing for the transition to the outside community." (R. 257). Dr. Pittenger noted that the plaintiff lived with a family he met through a friend, took buses for transportation as needed, was able to cook and clean if necessary, shop in stores as needed, occasionally visited his brother in Boston on the weekends, and had some contact with his daughter. (R. 257). Dr. Pittenger concluded that the plaintiff would benefit from vocational rehabilitation services, outpatient psychotherapy, and anti-depression treatment. The doctor also stated that careful monitoring for relapse to substance abuse would be "essential." (R. 259). Dr. Pittenger estimated the plaintiff's Global Assessment of Functioning (GAF) score to be a 55.[3] (*Id.*)

The results of Dr. Yufit's and Pittenger's CEs were sent to state agency physician Dr. John Jao to review. (R. 82-91). On February 8, 2012, after reviewing the CE results and the records of the plaintiff's visits with NP Alpert and cardiologist Dr. Schachne, Dr. Jao concluded that the plaintiff was not disabled. (R. 85, 91). Dr. Jao noted that the plaintiff had "bad knees, [a] herniated disc in [his] back, hypertension and depression." (R. 86). Dr. Jao also noted that "there was no unusual psychiatric observation of either anxiety or depression." (R. 86). Dr. Jao found that the plaintiff's hepatitis, spine disorders, osteoarthrosis and allied disorders were severe medically determinable impairments, but that the plaintiff's drugs, substance addiction disorders, personality disorders, and affective disorders were non-severe impairments. (R. 86-87). Dr. Jao concluded that the plaintiff could lift 20 pounds occasionally, lift 10 pounds frequently, stand and/or walk with normal breaks for 6 hours in an 8-hour workday, and push or pull without restriction. (R. 88-

---

[3] The Global Assessment of Functioning (GAF) scale is used for "reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social, and occupational functioning." *Grant v. Colvin*, No. 13-13102, 2015 WL 4945732 (D. Mass. Aug. 20, 2015) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text revision 2000)). "GAF scores in the 51-60 range indicate 'moderate' symptoms or difficulty in functioning." *Id.*

89).  In support of these conclusions, Dr. Jao referenced Dr. Yufit's physical CE, which showed a "full range of motion of lumbar spine without focal neurologic deficit and full range of motion right knee without effusion and some crepitus."  He noted that the CE also showed a normal gait, and that the x-ray ordered as a result of the CE showed "minor degenerative changes of lumbar spine and right knee suggestive of early lumbar spondylosis and osteoarthritis of the knee."  (R. 89).  Dr. Jao also indicated that the plaintiff "showed no stigma of chronic liver disease."  (R. 89). Based on these findings, Dr. Jao opined that the plaintiff would be unable to perform his past relevant work but could perform other jobs that exist in the national economy.[4]  (R. 90-91).

### iii.   The Plaintiff Continues with Follow-up Appointments

On February 14, 2012, the plaintiff returned to see Dr. Schachne the cardiologist to follow-up on his blood pressure and hypertension.  (R. 275).  Dr. Schachne noted that the plaintiff's hypertension management needed to be increased, that he needed to manage his salt and sodium intake, and that he needed to decrease his use of alcohol, which the plaintiff reported as being an occasional beer on the weekend.  (R. 275).

On March 13, 2012, the plaintiff returned to the cardiologist for another follow-up.  Dr. Schachne noted the need to adjust the plaintiff's hypertension medications yet again but also noted that the plaintiff was working as hard as he could to change his diet.  (R. 274).

On May 1, 2012, the plaintiff saw Dr. Schachne again.  Dr. Schachne noted that the plaintiff still had high blood pressure despite the medication.  (R. 261).  Dr. Schachne adjusted the plaintiff's medications and asked him to return for a follow-up in one week.  (R. 261).  On May 10, 2012, the plaintiff appeared for the follow-up and Dr. Schachne noted that other than drinking three or four beers per night, the plaintiff was compliant with instructions regarding his medication

---

[4] Given Dr. Jao's findings, the SSA then formally denied the plaintiff's request for SSI benefits, on February 23, 2012 (R. 102-04).

and diet.   Dr. Schachne noted that the hypertension medication did not seem to be working, however.  (R. 260).  The cardiologist referred the plaintiff for a renal exam in order to determine whether kidney issues were contributing to his hypertension and resistance to medications.  (R. 260).  The renal exam came back normal.  (R. 265-66).  On July 18, 2012, Dr. Schachne indicated that he wanted the plaintiff to see a hypertension specialist.  (R. 271).  In the interim, Dr. Schachne adjusted the plaintiff's medications and noted that the plaintiff was going to ride his bike to pick up his new medication because he had no other transportation.[5]  (R. 271).

### iv.   A Second State Agency Physician Reviews the Plaintiff's Records

Meanwhile, also on July 18, 2012, state agency physician Dr. Rosario Palmeri reviewed the plaintiff's records in conjunction with the plaintiff's request for a reconsideration of the denial of his SSI application.  (R. 92-101).  Dr. Palmeri reviewed the notes of NP Alpert and Dr. Schachne, along with the CEs conducted by Dr. Yufit and Dr. Pittenger.  Dr. Palmeri noted, however, that there were no medical records, other than the CE report, pertaining to the plaintiff's back, arm and knee pain.  (R. 97).  Dr. Palmeri noted that the plaintiff indicated his willingness to attend another CE if necessary.  (*Id.*)   Dr. Palmeri found the plaintiff's hepatitis, spine disorders, and osteoarthrosis and allied disorders to be severe impairments, but found his obesity, drug and alcohol addiction, personality disorders, and affective disorders to be non-severe impairments.  (R. 98).  Dr. Palmeri noted that the plaintiff could occasionally lift or carry 20 pounds, frequently lift 10 pounds, stand or walk with normal breaks for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push or pull without limitation.  (R. 98-99).  When asked to support these findings, Dr. Palmeri relied on Dr. Yufit's CE that indicated the following, verbatim:

---

[5] This is noted because the plaintiff completed a questionnaire on June 5, 2012 in connection with his request for reconsideration of the denial of his SSI application.  (R. 202-217).  When asked what he was able to do before his illnesses, injuries, or conditions that he could no longer do, the plaintiff answered, among other things, that he could no longer take bicycle rides.  (R. 211).

> full range of motion of lumbar spine without focal neurologic deficit and full range of motion of lumbar spine without focal neurologic deficit and full range of motion right knee without effusion and some crepitus. Gait normal.  X-ray showed minor degenerative changes of lumbar spine and right knee suggestive of early lumbar spondylosis and osteoarthritis of the knee. He showed no stigma of chronic liver disease but his liver function test moderate increase in transaminases. (R. 99).

Dr. Palmeri found that the plaintiff was unable to perform his past relevant work, but could perform other work in the national economy.  Dr. Palmeri concluded that the plaintiff therefore was not disabled. (R. 100-01).  Based on Dr. Palmeri's findings, the plaintiff's request for reconsideration was denied on July 18, 2012. (R. 107).

> ### v.   *The Plaintiff Continues Receiving Treatment for his Conditions and Obtains a new Primary Care Physician*

Despite the denial of his SSI reconsideration, the plaintiff continued with his medical treatment.  On August 27, 2012, and per the referral of his cardiologist, the plaintiff visited with Fall River Nephrology, an office that specializes in kidney treatment and hypertension. (R. 302).  There, the kidney and hypertension specialist, Dr. Swetha Nataraj, noted that the plaintiff needed at least 4 different medications to control his hypertension, but there was concern over his ability to afford the medication and to obtain transportation to his appointments. (R. 304).  Dr. Nataraj pointed out that the plaintiff had walked over 2 hours to make it to his appointment that day because of his lack of transportation, but asked that the plaintiff return for a follow-up in 4 weeks. (*Id.*)

On September 25, 2012, the plaintiff was evaluated by Linda Manansala, Ed. D. of the University of Massachusetts Disability Evaluation Service as part of an application for state disability aid. (R. 354-359).  The plaintiff explained to Dr. Manansala that he had anxiety, "trouble being around groups of people," "gets nervous in supermarkets," "cannot sleep much," and felt like "everything [was] coming down on [him] lately." (R. 354).  The plaintiff indicated that he

had never been on medication for anxiety and had been experiencing anxiety since his release from

jail in December 2011. (*Id*.) The plaintiff also informed Dr. Manansala that he had recently moved

in with his mother in Boston because he was unable to get to his doctor's appointments from where

he had been living. (*Id*.) Dr. Manansala reviewed the plaintiff's medical history and noted that he

complained of "bad knees," "a left arm injury" and a "herniated disk [sic] in his back." (R. 355).

Dr. Manansala noted the plaintiff's vocational history and she examined his current functioning.

(R. 356). The plaintiff reported that he relied upon public transportation or rides from his mother

for transportation, but that he sometimes had to "get off the bus" because he got "so anxious." He

said that he woke up around 5 a.m., groomed himself, watched the news, and had breakfast, but

also sometimes stayed in bed when his legs and back hurt too much. The plaintiff reported that he

made his own dinner, helped his mother as much as he could with cleaning, washing dishes, taking

out the trash, or doing laundry, and shopped with his mother once a week. The plaintiff stated that

he went to bed around 9 p.m. with varying sleep quality. (R. 356-57). Dr. Manansala noted that

the plaintiff appeared anxious but that he was pleasant, able to sit through the interview, appeared

to have average intellectual functioning, coherent thoughts, and concrete thinking capability. (R.

357-58). Based on her evaluation of the plaintiff, Dr. Manansala concluded that the plaintiff had

an overall GAF score of 53. (R. 359).

Shortly thereafter, the plaintiff began seeing a new primary care physician, Dr. Michael

Lowney. On October 19, 2012, Dr. Lowney saw the plaintiff and noted that he had an upper arm

injury and hard time lifting things, had pain in both knees which the plaintiff described as being

an 8 out of 10 on a pain scale, and that his level of pain worsened when he was sitting, standing,

walking, bending, climbing stairs, lifting, pulling, pushing, reaching or gripping. (R. 295-96). It

appears that Dr. Lowney referred the plaintiff for an MRI and to physical therapy, and also referred

him to Dr. Charles Dow for his blood pressure and hypertension.  (R. 295).

In November 2012, the plaintiff saw Dr. Charles Dow on two occasions. (R. 309-14). During his first visit on November 19, 2012, Dr. Dow noted that the plaintiff did not appear to be compliant with the medications prescribed to him by Dr. Lowney, and that Dr. Dow was adjusting the plaintiff's medications and ordering "a full battery of lab tests."  (R. 309-10).  Dr. Dow also instructed the plaintiff to stop drinking, as the plaintiff had indicated that he was then drinking a 12 pack of beer on the weekends.  (*Id.*)  The plaintiff returned a week later for a blood pressure check.  Dr. Dow noted that his blood pressure was improving and that he appeared to be "quite compliant" with his medications.  Dr. Dow asked him to return for a follow up in two weeks.  (R. 313).

On December 10, 2012, the plaintiff met with Dr. Lowney, and then with Dr. Dow for his follow-up.  Dr. Lowney noted the plaintiff's bad knees, lower back pain, and upper arm injury, and also noted that the plaintiff was experiencing a lack of motivation and was feeling depressed. (R. 293).  Dr. Lowney ordered a diagnostic test to be done on the plaintiff's knees, and indicated that the plaintiff wanted to see a psychiatrist and attend physical therapy.  Dr. Lowney planned to call Massachusetts Health for these referrals.  (R. 293).  Later that same day, the plaintiff visited Dr. Dow regarding his hypertension.  (R. 306).  Dr. Dow noted that the plaintiff's blood pressure was improving but "the diastolic was still moderately elevated," and that the plaintiff admitted to continuing to drink a case of beer on the weekends.  (*Id.*)  Dr. Dow also noted that a liver function test showed "markedly elevated" AST and ALT liver enzyme levels.  Dr. Dow discussed referring the plaintiff to a hepatology clinic for further blood pressure adjustments even though the plaintiff reported no liver-related symptoms.  (*Id.*)

On January 2, 2013, the plaintiff saw Dr. Lowney for a wellness exam.  (R. 290).  Dr.

Lowney noted that the plaintiff had missed 4 days of his blood pressure medication because he did not have any refills left.  (R. 290).  The plaintiff also completed an intake form on which he noted that he had high blood pressure, drank a couple of beers on the weekends, had little interest or pleasure in doing things, and felt down, depressed or hopeless several days out of the week.  (R. 291-92).  The plaintiff saw Dr. Lowney again two days later, on January 4, 2013.  Dr. Lowney noted that the plaintiff had yet to make an appointment with the hepatologist as Dr. Dow had suggested.  (R. 289).  On January 11, 2013, Dr. Lowney saw the plaintiff and ordered an x-ray after seeing that the plaintiff was still suffering from knee and back pain.  (R. 288).  Dr. Lowney also noted that the plaintiff had scheduled his appointment with the hepatologist.  (*Id*.)

On February 5, 2013, the plaintiff underwent an x-ray on both knees at New England Baptist Hospital.  (R. 283).  According to the report, the x-ray revealed mild medial femorotibial joint space narrowing at the left knee with mild spurring.  No significant joint effusion was identified, no osseous lesions were identified, and no soft tissue abnormalities were seen.  (R. 284).

Also on February 5, 2013, the plaintiff had a hepatology exam at the Beth Israel Liver Center.  (R. 318-321).  The plaintiff met with Dr. Parham Safaie Semnani and Dr. Lau, and they prepared an assessment for Dr. Lowney.  Dr. Semnani reported the plaintiff's medical problems to be hepatitis C, hypertension, and significant back and knee pain.  (R. 318).  In reviewing the plaintiff's social history, Dr. Semnani noted that the plaintiff drank two to three beers per night, lived with his mother, and was unemployed.  (*Id*.)  For the family history, Dr. Semnani explained that the plaintiff's father was an alcoholic and died from complications of liver cirrhosis and also had hypertension.  (R. 318-19).  When reviewing the plaintiff's symptoms, Dr. Semnani noted that the plaintiff denied "any symptoms of chronic liver disease."  He noted that the plaintiff "does have significant joint pain, particularly in his back and his knees, but he denies any systemic joint

symptoms." (R. 319). Dr. Semnani noted that the plaintiff was "a pleasant male in no distress" and did "not seem to have any obvious stigmata of liver disease," but noted that his liver was "palpable and enlarged at least 1 to 2 cm below the costal margin" and that his "extremities were benign." (*Id*.) Dr. Semnani noted that the plaintiff had a borderline low platelet count which suggested "possible advanced liver disease" and, depending on the staging of his liver disease, a determination would need to be made regarding the proper medication. (R. 320). Dr. Semnani scheduled the plaintiff for an ultrasound and explained that the standard of therapy for his liver treatment would be interferon-based, but that the plaintiff's underlying psychosocial and anger issues did not make him an ideal candidate. (*Id*.) Dr. Semnani noted that an oral medication was likely to be approved within the next year and would be a safer treatment option. (*Id*.) Dr. Semnani commented that the plaintiff's blood pressure needed to be closely monitored and that the plaintiff received "extensive counseling regarding cutting down on alcohol." (R. 321).

On February 22, 2013, the plaintiff returned to Dr. Lowney. He reviewed the plaintiff's knee x-ray and noted that the plaintiff recently saw a liver specialist. (R. 286). Dr. Lowney continued to note the plaintiff's hypertension, knee pain, and now possible liver disease. (*Id*.)

On February 25, 2013, the plaintiff underwent an ultrasound. (R. 337). The findings indicated that the "liver demonstrates normal contour, increased coarsened echogenicity and architecture." In addition, no focal lesions were identified and the plaintiff's portal vein was "hepatopetal and patent." Further, the plaintiff's liver was "consistent with fatty infiltration" but other "forms of liver disease and more advanced liver disease including significant hepatic fibrosis/cirrhosis c[ould not] be excluded" based on the ultrasound. (*Id*.)

Upon receiving the ultrasound results, the plaintiff returned to the liver center to visit with Drs. Semnani and Lau for a follow-up. (R. 332-34). Dr. Semnani referenced the plaintiff's

hepatitis C, hypertension, "significant back and knee pain," and his underlying liver disease. (R. 332). Dr. Semnani noted that the plaintiff's ultrasound "showed a coarse echotexture of the liver consistent with possible advanced fibrosis" and that he also had an enlarged spleen. (*Id*.) Dr. Semnani noted that the plaintiff is "a significant drinker" who, despite trying to cut down, still drank "at least up to a six-pack of beer on the weekends." (R. 332-33). Upon review of the plaintiff's symptoms, Dr. Semnani explained again that the plaintiff's psychiatric history and anger issues rendered him a bad candidate for interferon-based therapy for his liver. (R. 333). Dr. Semnani's assessment as a result of this follow-up appointment was that the plaintiff was "likely to have underlying cirrhosis based on [the] recent workup supported by borderline lower platelet, enlarged spleen, suggestive of some portal hypertension." Dr. Semnani further noted that the plaintiff "had elevated transaminases in the 300 range, and alpha-fetoprotein of 11.5, all indicative of significant inflammation in the liver." (R. 333). Dr. Semnani explained that the plaintiff would need to be treated for his hepatitis C given the underlying advanced fibrosis. Dr. Semnani expressed concern that the plaintiff's underlying psychiatric background would be a problem for treatment. The doctor opined that "a short course of interferon-based therapy" with close monitoring might be beneficial if the plaintiff could establish a rapport with a therapist or psychiatrist. (R. 334). Dr. Semnani noted that oral medications were still unavailable and stressed in the meantime the importance of cutting down on alcohol and stopping it altogether if possible. (*Id*.) Dr. Semnani recommended that the plaintiff establish a rapport with a therapist so that by his next visit perhaps they could treat him with a short course of lower dose interferon-based therapy. (*Id*.) In preparing this report for Dr. Lowney, Dr. Semnani also asked that Dr. Lowney closely monitor the plaintiff's blood pressure because the plaintiff had elevated blood pressure levels which needed to be addressed as soon as possible. (*Id*.)

The plaintiff visited with Dr. Lowney shortly thereafter, on March 22, 2013. (R. 285). Dr. Lowney noted that the plaintiff's knee pain was a 6 out of 10 on a pain scale and that the plaintiff needed treatment for his hepatitis C. (*Id*.)

In May of 2013, the plaintiff began seeing psychotherapists Dirk Kimmerle, M.Ed, and Dr. Anthony Roynes for bi-weekly counseling sessions. (R. 346).

On August 14, 2013, Dr. Lowney submitted an RFC questionnaire to the SSA relating to the plaintiff's physical impairments. (R. 341-345). The questionnaire noted that the plaintiff had been diagnosed with hypertension, depression, a left upper arm injury, anxiety, hepatitis C, and bilateral knee pain, all of which had a "good" prognosis. (R. 341). Dr. Lowney described the plaintiff's symptoms as back pain, difficulty lifting with his left arm, and knee pain four times per week that was exacerbated by standing too long. The plaintiff reported that his pain was an 8 out of 10 on a pain scale. (*Id*.) Dr. Lowney stated that the plaintiff's impairments could be expected to last more than a year, and that his depression, anxiety, and anger management issues contributed to the severity of his symptoms and functional limitations. (R. 342). Dr. Lowney opined that the plaintiff's pain and other symptoms were severe enough to frequently interfere with his attention and concentration, and that he had a moderate limitation in his ability to deal with work stress. (R. 342-43). Dr. Lowney opined that if the plaintiff were placed in a competitive work environment, he could walk three city blocks without rest, continuously sit for two hours, stand for more than two hours, sit, stand and/or walk for about two hours in an eight-hour workday, would need two minute periods of walking around every 90 minutes during an eight-hour workday, would need a job that permits shifting positions at will, and would need to take unscheduled 5 minute breaks during an eight-hour workday. (R. 342-44). Dr. Lowney noted that the plaintiff could lift and carry less than ten pounds frequently, ten pounds frequently, twenty pounds occasionally, and fifty

pounds occasionally, and had significant limitations in doing repetitive reaching and handling in his left arm.  (R. 344).  Dr. Lowney also anticipated that the plaintiff's impairments would cause him to be absent from work more than three times per month.  (R. 345).

On September 12, 2013, Mr. Kimmerle and Dr. Roynes, the therapists whom the plaintiff had been seeing bi-weekly since May of 2013, submitted a mental impairment questionnaire to the SSA on the plaintiff's behalf.  (R. 346-352).  They identified the plaintiff's symptoms as: poor memory; mood disturbance; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; anhedonia or pervasive loss of interest; generalized persistent anxiety; difficulty thinking or concentrating; and hostility and irritability.  (R. 346-47).  When asked to describe the clinical findings that demonstrated the severity of the plaintiff's symptoms, Mr. Kimmerle and Dr. Roynes explained that the plaintiff had "extreme anxiety in crowded areas," "had a loss of interest in things he used to enjoy," was isolating himself and was "afraid to interact with people because of what his reaction might be." (R. 347).  Mr. Kimmerle and Dr. Roynes noted that the plaintiff was undergoing individual therapy and taking Paxil.  (R. 348).  Mr. Kimmerle and Dr. Roynes explained that the plaintiff would need "extensive therapy and medication for a fair prognosis," and that his impairments could be expected to last at least twelve months. (R. 348).  Mr. Kimmerle and Dr. Roynes also noted that the plaintiff's psychiatric condition exacerbated the plaintiff's experience of pain and other physical symptoms in that he felt tired and physically unable to move in the mornings.  (*Id*.)

When asked to evaluate the plaintiff's mental abilities and aptitude to do unskilled work, Mr. Kimmerle and Dr. Roynes opined that the plaintiff would be good at remembering work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, making simple work-related decisions, performing at a consistent

pace without an unreasonable number and length of rest periods, asking simple questions or requesting assistance, and being aware of normal hazards to take appropriate precautions. (R. 349-50). They also opined that the plaintiff would be fair at maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (*Id.*) Lastly, they indicated that the plaintiff would be poor at maintaining attention for a two hour segment, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.*) When asked to describe the areas where the plaintiff was "fair" or "poor," Mr. Kimmerle and Dr. Roynes explained that the plaintiff is unable to focus or concentrate "due to his anxiety in social settings" and that he tends to be "agoraphobic and avoiding social settings at all costs." (R. 350).

In evaluating the plaintiff's mental abilities to perform semiskilled and skilled work, Mr. Kimmerle and Dr. Roynes opined that the plaintiff would be good at setting realistic goals or making plans independently of others, and fair at understanding and remembering detailed instructions, carrying out detailed instructions, and dealing with the stress of semiskilled and skilled work. (R. 350). When asked to explain these findings, Mr. Kimmerle and Dr. Roynes explained that the plaintiff has a "history of physical altercations with others [and] suffers from extreme anxiety when placed under pressure." (*Id.*)

With respect to the plaintiff's mental abilities to perform particular types of jobs, Mr. Kimmerle and Dr. Roynes opined that the plaintiff would be good at adhering to basic standards of neatness and cleanliness, and would be fair at interacting appropriately with the general public,

17

maintaining socially appropriate behavior, traveling in an unfamiliar place, and using public transportation.  (R. 351).  They cautioned though that the plaintiff is "unable to cope in any type of social situation" and has "panic attacks in unfamiliar settings."  (*Id.*)

Finally, Mr. Kimmerle and Dr. Roynes evaluated the degree and type of limitations the plaintiff's mental impairments caused.  They found that the plaintiff had had one episode of decompensation of extended duration, that he had moderate limitations in restrictions of activities of daily living and deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and that he had an extreme limitation in maintaining social functioning.  (R. 351).  They also noted that the plaintiff described being in "constant physical pain" and that he had a "difficult time walking or lifting."   They concluded that the plaintiff had a GAF score of 58.  (R. 346, 351).

c.   <u>The Administrative Hearing Before the ALJ</u>

i.   *The Plaintiff's Testimony*

On September 26, 2013, the ALJ convened an administrative hearing.  (R. 44-81).  After answering questions about his background and past relevant work, the plaintiff testified that he had back pain, knee pain and arm pain, and suffered from depression and anxiety.  (R. 50).

The plaintiff testified that he saw psychiatrist Dr. Roynes once a month and saw Mr. Kimmerle, his therapist, every other week.  (R. 52).  He stated that he saw his primary care physician, Dr. Lowney, once a month for his blood pressure, and that he had been seeing doctors at the liver center for his hepatitis C.  (R. 53).

The plaintiff also testified that he isolated himself and did not like being around other people.  (R. 54).  The ALJ commented "you do ride buses, though," to which the plaintiff replied "yea, it's too much trouble, though. I can't be around people. I feel closed in." (*Id.*)  The plaintiff

testified that he had anxiety, nervousness and wanted to get away, and would go to the supermarket with his mother because it was too hard to go alone.  (R. 55).

When asked how far he could walk, the plaintiff testified that he could walk for about two blocks but then would get lower back pain and his knees would start to hurt so he would need to stop for about 10-15 minutes to sit down.  (R. 55-56).  He testified that he could not sit for more than 45 minutes without getting lower back pain and would need to get up and move around for at least two to three minutes, could not lift more than ten pounds with his left arm, and was not sure how much he could lift with his right arm because it would ultimately hurt his back if it was too heavy.  (R. 56-57).

The plaintiff also testified about his social life.  He explained to the ALJ that he did not have any friends, usually just stayed home, did not belong to any clubs or organizations, and did not have any hobbies or activities.  (R. 58).  The plaintiff testified that he was able to get himself dressed for the day and sometimes could help his mother with chores by loading the washer or cooking for himself.  He also testified he would wash dishes that he used, and try to help her at the supermarket by pushing the shopping cart.  (R. 58-60).

The ALJ questioned the plaintiff about his alcohol use by asking whether he has ever had any problems with alcohol.  The plaintiff responded that he had "in the past" about "ten years ago." (R. 63).  In response, the ALJ asked "so you've been sober for 10 years?" to which the plaintiff replied "yea and drug free, too."  (*Id.*)  The ALJ then referenced the plaintiff's medical records referring to his use of alcohol and the plaintiff admitted that he did "have two or three beers on the weekends. That's about it."  (R. 63-64).

> ii.  *The Vocational Expert Testimony*

The ALJ also took testimony from vocational expert James Conway.  (R. 73-79).  The

vocational expert testified that the plaintiff had past relevant work as a carpenter.  (R. 74).  The ALJ first asked the vocational expert to:

> assume a person of claimant's age, education and work experience is able to perform at the light level, lift up to 20 pounds occasionally, lift or carry 10 pounds frequently. Stand or walk for approximately six hours per eight hour work day, and sit for approximately per eight hour work day [sic].   Allow this person to sit or stand alternatively at will provided the person is not off task more than 10 percent of the work period. Only occasional ladders, ropes and scaffolds. Only occasional stooping, crouching, kneeling, crawling. Overhead reaching is limited on the left side to occasional. Only occasional interaction with the public. Only superficial interactions. Only occasional interactions with co-workers … and no tandem tasks [meaning] the two people are working together and the person – the hypothetical person – relies on the other person to complete their task before they can do that. And by occasional, I mean less than one-third of the time.

(R. 74-76).  When asked if this hypothetical person could perform the plaintiff's past relevant work, the vocational expert testified "in my opinion, no."  (R. 76).  The vocational expert testified that there would be other jobs in the economy that such a hypothetical person could perform, however.  (*Id.*)  Those jobs included a parking lot attendant, car wash attendant, and a ticket seller. (R. 76-77).  The vocational expert further testified that there were 20,000, 43,000, and 19,000 jobs respectively for those positions available in the United States, and 600, 400, and 350 positions respectively available in the local Massachusetts economy.  (*Id.*)

The ALJ posed a second hypothetical to the vocational expert, asking him to

> assume a person of claimant's age, education and experience who's able to perform at the sedentary level, lift up to 10 pounds occasionally, stand or walk for approximately two hours per eight hour work day, and sit for approximately six hours per eight hour work day. Sit, stand option, allow this person to sit or stand alternatively at will provided not off task more than 10 percent of the work period. Same postural limitations I gave you. Same manipulative limitations I gave you, and the same social functioning deficits. The claimant had no prior work at the sedentary level.

(R. 76-77).   The ALJ asked the vocational expert if there were jobs in the economy such a hypothetical person could perform at the sedentary level.   The vocational expert responded in the affirmative.   (R. 77-78).   The vocational expert testified that such jobs would include an auto locator, a dispatcher of maintenance, and a telephone solicitor.   (R. 78).   The vocational expert further testified that there were 172,000, 16,000, and 125,000 jobs respectively for those positions available in the United States, and 3,400, 3,000, and 2,000 jobs respectively for those positions in Massachusetts.   (*Id.*)

The vocational expert also testified that if such person were to be off task 20 percent of the time, they would be unable to do those jobs.   (R. 79).   The vocational expert also indicated that an individual who would need to get up and walk around every 90 minutes for two to three minutes and is not able to concentrate during that time would not be able to work.   (R. 79).

### iii.   The ALJ's Findings

On October 18, 2013, the ALJ found that the plaintiff was not disabled.   (R. 16, 19).   The ALJ noted that in order to be eligible for SSI benefits under section 1614(a)(3)(A), the plaintiff must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."   (R. 19).   The ALJ applied a five-step evaluation to determine that the plaintiff did not meet this standard.

Step one considers whether or not the plaintiff is engaging in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled.   20 CFR § 416.920(b).   SGA is defined as work activity done for pay that involves doing significant physical or mental activity.   20 CFR § 416.972(a).   The ALJ found that the plaintiff had not engaged in SGA since the date of

his SSI application, December 19, 2011.  (R. 21).

Step two considers whether or not the plaintiff's impairment(s) is severe as defined by the pertinent regulations.  20 CFR § 416.920(c).  The ALJ found that the plaintiff had several severe impairments, including lumbar degenerative disc disease (DDD), right knee degenerative joint disease (DJD), status-post left upper extremity laceration, anxiety, and alcohol abuse in reported remission.  (R. 21).  The ALJ reached this conclusion after determining that the impairments met the *de minimis* severity threshold in that they more than minimally limited the plaintiff's ability to perform work-related activities and were, therefore, severe impairments.  (*Id.*)  Conversely, however, the ALJ found the plaintiff's hypertension and hepatitis C to be non-severe impairments because no evidence suggested that either impairment more than minimally limited the plaintiff's ability to perform work-related activities.  (R. 21).  In so finding, the ALJ explained that treatment notes indicated the plaintiff's hypertension was "completely asymptomatic" and, while the plaintiff's hepatitis C lab results were suggestive of advanced liver disease, the plaintiff denied having any symptoms of chronic liver disease.  (*Id.*)

Steps three, four and five operate in tandem.  Step three requires the ALJ to consider whether or not the plaintiff's impairments taken together are severe enough to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  20 CFR §§ 416.920(d), 416.925, and 416.926.  If so, the claimant is conclusively presumed to be disabled.  If not, one moves to step four, which considers whether the applicant's RFC allows him to perform his past relevant work.  If the claimant is capable of performing past relevant work, he is not disabled.  If the claimant's RFC in step four does not allow him to perform his past relevant work, the burden shifts to the Commissioner in step five to prove that the claimant is still "able to perform other work in the national economy in view of [the claimant's] age, education, and work

experience." 20 C.F.R. §§ 416.912(g) and 416.920(c).

Here, the ALJ found at step three that the plaintiff's impairments did not meet or medically equal the severity criteria of an impairment listed in the pertinent regulations. The ALJ explained that the plaintiff's spinal and mental impairments did not rise to the level required by the pertinent regulations. He noted that the plaintiff only had mild restrictions in daily living as demonstrated by the plaintiff's testimony that he was able to clean, wash dishes, do laundry, and take out the trash; that the plaintiff had moderate difficulties with social functioning in that he had difficulty being around people but that he got along with family and friends, was able to shop in stores, use public transportation with some reported anxiousness, had no difficulty with regard to concentration, persistence or pace, and that he had not experienced any extended episodes of decompensation. (R. 22).

The ALJ thus continued to step four and found that the plaintiff had the RFC to perform light work, albeit with some limitations:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant: can lift twenty pounds occasionally and ten pounds frequently; can sit for approximately two hours in an eight-hour workday; can stand and/or walk for approximately six hours in an eight-hour workday; requires the ability to sit and stand alternatively provided that he would not be off task for in excess of 10% of the workday; can occasionally climb ropes, ladders, and scaffolds; can occasionally stoop, crouch, kneel, and crawl; is limited to occasional overhead reaching with the left upper extremity; is limited to occasional superficial contact with the general public; and is limited to occasional interaction with coworkers but is unable to engage in tandem work.

(R. 23). In reaching this finding, the ALJ considered the plaintiff's symptoms and found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting

effects of those symptoms were not entirely credible. (R. 24). The ALJ explained that the objective medical evidence did not support the plaintiff's allegations of disabling back, knee and left arm pain. (*Id*.) The ALJ referenced Dr. Yufit's findings that the plaintiff presented with a normal gait and had grossly normal range of motion throughout his spine with no clinical evidence of nerve root compression, and that he displayed a normal range of motion, no effusion, and good alignment in his knees bilaterally with "maybe" some crepitus on the right. (*Id*.) The ALJ discounted the plaintiff's complaints of left arm weakness because Dr. Yufit found that he exhibited normal left upper extremity strength and grip and normal left shoulder range of motion. (*Id*.) The ALJ also explained that the plaintiff's February 5, 2013 bilateral knee x-ray showed "mild" left knee joint space narrowing without significant effusion or evidence of soft tissue abnormalities. (R. 25). The ALJ also pointed to the plaintiff's limited treatment history as being inconsistent with his allegations of disabling back, knee, and arm pain. The ALJ noted that the plaintiff was not prescribed any pain medications, had not been referred for any surgeries, and had not attended any physical therapy. (R. 25). Further, the ALJ referenced the fact that the plaintiff rode a bicycle to his July 2012 cardiology appointment and that he reported being "fairly active physically" at a December 2012 appointment as evidence that his limitations were not as severe as alleged. (*Id*.)

Moreover, the ALJ found the plaintiff's anxiety symptoms to be unsupported by the record. The ALJ explained that the plaintiff had not experienced any extended episodes of decompensation, did not present with any "unusual anxiety or evidence of depression" at his December 2011 appointment with NP Alpert upon being released from prison, and despite reporting a depressed and anxious mood during his mental CE with Dr. Pittenger, the plaintiff's mental status was grossly within normal limits. (R. 25). The ALJ went on to note that the plaintiff

was able to use public transportation and did not have any issues getting along with family, friends, and neighbors.  (*Id*.)  The ALJ also found that the plaintiff's activities of daily living were inconsistent with his allegations of total disability.  (*Id*.)

The ALJ also found the plaintiff's credibility to be undermined by his inconsistent testimony regarding his use of alcohol.  (R. 25-26).  The ALJ explained that the plaintiff testified during the hearing that he had been sober for ten years though he subsequently acknowledged drinking "a couple of beers" on the weekends.  (*Id*.)  The ALJ found these statements to be in conflict with his medical records indicating that he drank "three or four beers per night" and a "twelve pack every weekend."  (R. 26).

In terms of the plaintiff's physical capabilities, the ALJ gave substantial weight to the opinions of the state agency physicians Dr. Jao and Dr. Palmeri, finding their opinions to be consistent with the objective evidence of record and the plaintiff's limited treatment history.  (R. 26).  In that regard, the ALJ noted that he gave limited weight to the August 2013 RFC questionnaire submitted by the plaintiff's primary care physician Dr. Lowney, finding that the disabling physical limitations noted by Dr. Lowney were not supported by the objective medical evidence of record.  In so finding, the ALJ referenced the CE with Dr. Yufit who found that the plaintiff did not present with any serious back, knee, or left arm clinical abnormalities, and that the plaintiff's x-rays only show mild knee DJD and mild to moderate lumbar DDD.  (R. 26).  In reviewing the relevant clinical and diagnostic evidence of record, the ALJ found that it did not support the disabling limitations contained in Dr. Lowney's findings.

In assessing the plaintiff's mental impairments, the ALJ gave little weight to the opinions of state agency physicians Dr. Jao and Dr. Palmeri because both noted that the record did not document any severe mental impairments.  (R. 26).  The ALJ explained that the plaintiff's recent

treatment history and moderate GAF scores were consistent with a severe mental impairment within the meaning of the pertinent regulations.  Even so, the ALJ also gave little weight to the September 2013 mental RFC questionnaire completed by Mr. Kimmerle and Dr. Roynes.  (*Id.*) The ALJ found the questionnaire to be internally inconsistent in that it described numerous disabling marked functional limitations but found a moderate GAF score of 58.  The ALJ also found Mr. Kimmerle and Dr. Roynes' findings to be inconsistent with the plaintiff's presentation at his CE with Dr. Pittenger, who found the plaintiff's mental status to be grossly within normal limits.  (*Id.*)

In looking at the evidence as a whole, the ALJ found that it was insufficient to establish the existence of impairments that accounted for the degree of the symptoms the plaintiff claimed to have.  Still, the ALJ found that the limitations to the plaintiff's residual functional capacity left him unable to do his past relevant work as a carpenter.  (R. 26).

Accordingly, the ALJ moved on to step five, to consider whether the plaintiff was capable of performing any other work given his RFC, age, education and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  (R. 21); *see Quaglia v. Colvin*, 52 F.Supp.3d 323, 331 (D. Mass. 2014) (noting that the SSA "has promulgated medical-vocational guidelines to aid" the inquiry of determining whether the claimant "has the ability to pursue another less physically or psychologically demanding career.").  In doing so, the ALJ noted that if "the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile." (R. 27).  Where the claimant could not "perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for

decisionmaking unless there is a rule that directs a conclusion of 'disabled' without consideration the additional exertional and/or nonexertional limitations." (*Id*.) The ALJ noted that if the claimant has the RFC "to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.18" and where the claimant has solely nonexertional limitations, the ALJ is to refer to "section 204.00 in the Medical-Vocational Guidelines" for a framework in decisionmaking. (*Id*.)

In applying these guidelines, the ALJ concluded that the plaintiff had limitations which would impede his ability to perform all or substantially all of a full range of light unskilled work. (*Id*.) In determining the extent of these limitations, the ALJ referenced the VE's testimony who found that, despite the plaintiff's limitations, he "would be able to perform the requirements of representative unskilled occupations in the light exertional range such as: parking lot attendant … car wash attendant … and ticket seller…." (*Id*.) The ALJ found the VE's testimony regarding the number of available positions to be consistent with the information contained in the Department of Labor's Dictionary of Occupational Titles (DOT). (R. 28) Based on the VE's testimony, and considering the plaintiff's age, education, work experience, and RFC, the ALJ found that the plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id*.) For that reason, the ALJ concluded that the plaintiff is "not disabled." (*Id*.)

On November 26, 2013 the plaintiff requested a hearing before the Appeals Council to review the decision of the ALJ. (R. 15) On January 13, 2015, the Appeals Council denied the request. (R. 1-3).

III.    **DISCUSSION**

The plaintiff argues that the ALJ committed three reversible errors. He argues first that the

ALJ improperly weighed the medical opinions and did not consider all of the available medical evidence in the record, including an MRI from 2005.  He argues second that the ALJ erred in assessing his credibility.  Finally, the plaintiff contends that the ALJ's finding at step five that the plaintiff is able to perform other jobs in the economy is not supported by substantial evidence.  The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the decision to give lesser weight to the treating physicians and to discount the plaintiff's credibility regarding the intensity, persistence, and limiting effects of his symptoms.  The Commissioner also contends that the ALJ met his burden at step five and substantial evidence supports the conclusion that the plaintiff is capable of performing other jobs in the economy.  As discussed below, the Court finds that there is merit to the plaintiff's first argument, and rejects the remaining claims or finds it unnecessary to resolve them.

 a. <u>Standard of Review</u>

 A court reviews the findings of an ALJ only to determine whether the findings are supported by substantial evidence, and whether the correct legal standard was applied.  *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015).  Substantial evidence to support a decision exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  *Id.*  This Court must keep in mind when applying this standard of review that it is the role of the ALJ, and not this Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Secretary of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  This Court may affirm, modify, or reverse the ALJ's decision, but reversal is only warranted if the ALJ made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate…to justify the conclusion" of the ALJ.  *Roman–Roman v. Commissioner of Soc. Sec.*, 114 Fed. Appx.

410, 411 (1st Cir. 2004).  This Court therefore must affirm the ALJ's decision if it is supported by

substantial weight, even if the record could arguably support a different conclusion.  *Evangelista*

*v. Secretary of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

> b.  Analysis

> > i.  *The ALJ Improperly Weighed the Medical Opinion Evidence*

An ALJ must "always consider the medical opinions in [the] case record." 20 C.F.R §

416.927(b).  The general rule is that a treating physician's opinion is entitled to controlling weight,

but the ALJ may discount the weight given to a treating source opinion where it is inconsistent

with other substantial evidence in the record, including treatment notes and evaluations by

examining and non-examining physicians.  *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass.

2004); 20 C.F.R. § 416.927(c) (Where controlling weight is not given to a treating source opinion,

the ALJ must consider several factors in determining the weight granted to an opinion, including

the length of treatment relationship and frequency of examination, the nature and extent of the

treatment relationship, and the consistency of the opinion with the record as a whole.).

In determining the weight to accord to the opinions of the plaintiff's treating physicians,

the ALJ may rely upon CEs – even older CEs – if they "remain accurate."  *Blackette v. Colvin*, 52

F. Supp. 3d 101, 114 (D. Mass. 2014) (quoting *Abubakar v. Astrue*, No. 1:11–cv–10456–DJC,

2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012)).  However, if "'there is an indication in more

recent records that there has been a significant change in the claimant's condition,' older medical

reports now inconsistent with that evidence may not be used to support an RFC determination."

*Id*.  "[I]t can indeed be reversible error for an administrative law judge to rely on an RFC opinion

of a non-examining consultant when the consultant has not analyzed the full medical record."  *Id.*

at 113 (quoting *Strout v. Astrue*, No. 08-181-B-W, 2009 WL 214576, at *8 (D. Me. Jan. 28, 2009)).

Further, in relying on an agency physician's medical opinion, when determining what weight to give that opinion, the ALJ must consider "the availability of most of the medical evidence to the non-examining physician." *Rosario v. Apfel*, 85 F.Supp.2d 62, 68 (D. Mass. 2000).

The plaintiff contends that the ALJ improperly weighed the medical opinion evidence regarding both his physical limitations and his mental limitations.

With respect to the plaintiff's physical limitations, the ALJ relied principally on the medical opinions of the agency physicians, Drs. Jao and Palmeri, who opined that the plaintiff had severe physical impairments, but that they did not limit him in a way that rendered him disabled. Drs. Jao and Palmeri, in turn, relied upon the prior 2012 consultative examinations by Drs. Yufit and Pittenger.  The ALJ acknowledged that Dr. Lowney subsequently completed an RFC questionnaire in 2013 supporting a finding that the plaintiff had disabling physical limitations but gave little weight to his opinion because it reportedly was not supported by the objective medical evidence of record which, the ALJ found, was largely a "benign" record of "limited treatment history."

The concern the Court has here is that there does not appear to have been a sound basis to accord significant weight to the agency physicians.  As Drs. Jao and Palmeri merely reviewed the record as it then existed, their opinions were based on a significantly incomplete record, and they were not well justified. See 20 C.F.R. § 416.927(d).  In particular, the physicians considered only records relating to the plaintiff's treatment in the several months following his release from prison in 2011, and never took into consideration Dr. Lowney's later opinion or records from other treating professionals.  Although the ALJ stated that the larger record was "benign," he did not explain how he reached this conclusion in light of the evidence itself.  The record was replete with evidence that the plaintiff complained of physical (and mental) health issues and one can fairly

wonder whether the agency physicians might have reached a different, more favorable opinion had they considered this evidence.[6]  Instead, unlike the record before the ALJ, the record they reviewed did not contain Dr. Lowney's treatment evidence or any of the other evidence suggesting the plaintiff's condition had changed or worsened since the agency physician's review.  As non-examining physicians their opinions still do matter, but they merited less *prima facie* credibility than treating and examining sources, and less credibility than more expert sources.  Absent a medical advisor's or consultant's assessment of the full record, or a better explanation of the weight being accorded to physicians who only reviewed a small portion of the record, the concern is that the ALJ effectively substituted his own judgment for medical opinion.

With respect to the plaintiff's mental limitations, the ALJ stated that he based his finding that the plaintiff did not have a severe limitation on the record as a whole.  The ALJ stated that he gave little weight to the psychological consultants (Dr. Pittenger, who in turn was relied upon by Drs. Jao and Palmeri), despite the fact that they similarly concluded that the record did not support any severe mental impairment.  The ALJ rejected their opinions because he found that the plaintiff's recent treatment history and GAF scores were in fact consistent with a severe mental impairment.  However, the ALJ then discounted the importance of that very same treatment history when he stated that he gave little weight to Dirk Kimmerle, the plaintiff's counselor, in part because Kimmerle's opinion was inconsistent with the plaintiff's "presentation at his consultative examination with Dr. Pittenger."  As such, it appears that the ALJ rejected Dr. Pittenger's negative

---

[6] The record shows that over the course of the next year, from July 2012 to August 2013, the plaintiff saw at least eight professionals and attended upwards of 20 appointments.  In the course of those appointments the plaintiff routinely complained of arm, back, and knee pain, doctors consistently tried to get his hypertension and blood pressure issues under control, possible advanced liver fibrosis and cirrhosis were discovered, and issues relating to treating his hepatitis C and liver disease were addressed.  Doctors also noted on several occasions that the plaintiff needed physical therapy and medication for his knee and back pain.  The plaintiff's deteriorating mental condition also became more of a focus, evidenced by the fact that his doctors regularly adjusted his medications and considered his psychological issues when determining the best course of treatment for his physical issues.

medical opinion as unreliable in light of the recent treatment history suggesting severe mental limitations, but then turned around and rejected the recent treatment history suggesting severe mental limitations as unreliable in light of Dr. Pittenger's negative opinion.  If this characterization of the ALJ's reasoning is correct, it would mean that the ALJ effectively (and erroneously) substituted his own judgment for medical opinion.  If by contrast the Commissioner is heard to respond that this characterization is incorrect, some additional clarification is warranted.

To be clear, these considerations took place at step four of the evaluation process and the Court is mindful that the ALJ went on to conclude that the plaintiff lacked the RFC to perform his past relevant work.  That does not render this issue moot, however, because the ALJ concluded at step five that there were other jobs the plaintiff could perform in the national economy.  It is reasonable to wonder whether the ALJ might have found differently had he concluded differently at step four, *i.e.,* had he found that the plaintiff did in fact suffer from disabling physical and/or mental limitations rendering him unable to work in any capacity.  Given the critical, dispositive nature of that determination, a remand is appropriate to allow the ALJ to consider the plaintiff's claims in light of the concerns raised here, or to provide greater clarity regarding the reasoning underlying his conclusions.  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Alcantara v. Astrue*, 257 Fed. App'x. 333 (1st Cir. 2007) (remanding for further proceedings where ALJ relied on a reviewing consultant's opinion based on incomplete record, and finding "[a]bsent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion.").

Further, it appears that neither the state agency physicians nor the ALJ considered the results from the plaintiff's 2005 pre-incarceration MRI showing a herniated disc at L4-5 and an L5-S1 disc bulge associated with posterior annular tear.  (R. 353).  The Commissioner has a

responsibility to develop a claimant's "complete medical history for at least the 12 months preceding the month in which the claimant filed [his] application *unless there is a reason to believe that development of an earlier period is necessary*." 20 C.F.R. § 416.912 (emphasis added). The 2005 MRI appeared in the record before the ALJ (R. 32), but the ALJ does not refer to it or reconcile it with the other available medical evidence. This evidence was (and is) potentially relevant because another ALJ in 2007 awarded the plaintiff SSI benefits after finding that the plaintiff's "impairments cause significant limitations in his ability to perform basic work activities." (R. 39). The ALJ here was of course not bound to consider the 2007 decision but it would appear that such a decision would at least give the ALJ "reason to believe that development of an earlier period is necessary." 20 C.F.R. § 416.912. In that regard, it is not clear whether Drs. Jao and Palmeri ever reviewed the MRI results in rendering their expert medical opinions. The MRI was listed in the "medical evidence of record" section of their reports but neither physician mentioned it in their findings, and Dr. Palmeri specifically noted that there were no medical records, other than the CE report, pertaining to the plaintiff's back, arm and knee pain. (R. 97).

While the ALJ may not have been required to explicitly determine whether the plaintiff's medical condition had improved since his 2005 MRI or 2007 disability determination[7], his decision must at least "include an explanation of the basis from which one might conclude that the plaintiff is not presently disabled although []he was earlier determined to be disabled. Relevant to that inquiry will be an evaluation of the longitudinal progression of the plaintiff's condition

---

[7] "When an individual is receiving SSI benefits, the Commissioner will conduct periodic reviews to determine whether that individual continues to meet the requirements of the law. 20 C.F.R. § 416.990. In conducting disability reviews for SSI benefits, the Commissioner applies a seven-step sequential evaluation process to determine whether there has been medical improvement in the individual's impairment(s) that is related to ability to do work. 20 C.F.R. § 416.994. This is often called applying the 'medical improvement' standard." *Brennan v. Astrue*, 501 F.Supp.2d 1303, 1308 (D. Kan. 2007). Where a plaintiff is incarcerated for a period of twelve months, their SSI benefits are terminated and in order to receive SSI benefits upon release, the plaintiff must file a new application. Where an individual is incarcerated for less than twelve months, however, their benefits may merely be resumed upon release. In those instances, the seven-step "medical improvement" standard governs. *Id*. at 1309.

including [an] evaluation of the medical records and opinions produced before the plaintiff was incarcerated….” *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1310-11 (D. Kan. 2007).  Thus, the matter must also be remanded so the Commissioner may seek expert medical advice regarding the plaintiff's current limitations in light of the record *in toto*, which properly should include the 2005 MRI results.  *Id.* at 1310.  In doing so, “[i]f the Commissioner determines that [the] plaintiff is not disabled, then he must explain why he found the claimant not disabled when the claimant had previously been found to be disabled.  Although the Court recognizes that there are perfectly legitimate and reasonable reasons for denying benefits at a later date when benefits were awarded earlier, those reasons must be set forth by the [ALJ] in his decision in order for this Court to engage in meaningful judicial review.” *Id.*

> ii. *It is Premature to Determine whether the ALJ Properly Evaluated the Plaintiff's Credibility*

The plaintiff also asserts that the ALJ erred in evaluating his credibility with respect to the intensity, persistence, and functionally limiting effects of his pain and other symptoms.  The plaintiff points out that the ALJ who found him to be disabled in 2007 credited his assertions surrounding the limiting effects of his pain.  The plaintiff also asserts that the 2005 MRI reveals physical impairments which would be consistent with the plaintiff's complaints of pain.  For the reasons noted above, because “the case must be remanded for a proper evaluation of the medical evidence and medical opinions, it would be premature for the Court to attempt to evaluate the ALJ's credibility findings and … [the] RFC assessment reached in the decision below.” *Id.* at 1311.  That being said, to the extent the following observations are helpful, the Court offers them here.

It is not clear whether the ALJ's grounds for rejecting the claimant's own reports of pain and mental impairments find full support in the record.  “Generally, credibility determinations

'must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the plaintiff.'" *Valiquette v. Astrue*, 498 F. Supp. 2d 424, 430 (D. Mass. 2007) (quoting *Da Rosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).  Here, in substance, the ALJ relied on three reasons for finding the plaintiff not credible: the apparent inconsistency between the plaintiff's subjective complaints and the objective medical record; the plaintiff's ability to ride his bicycle or engage in other daily activities; and the inconsistent statement to the ALJ about his use of alcohol.  Though the ALJ did make reference to particular parts of the record in his findings on credibility, it is not self-evident that those references support the ALJ's credibility assessment.

First, as noted, the plaintiff's subjective complaints may not have been inconsistent with the objective medical record as a whole.  In that regard, the ALJ commented on the plaintiff's lack of pain medications or physical therapy to support his finding that the plaintiff's complaints of pain were not entirely credible.  However, the record is full of evidence demonstrating the plaintiff's consistent complaints of back, knee, and left arm pain, and the record also shows that the plaintiff's treating physicians' referred him to physical therapy.  The plaintiff's failure to attend physical therapy is plausibly consistent with the fact that he lacked adequate transportation methods and the financial resources to attend.  In other words, his failure to undergo physical therapy may not necessarily be inconsistent with his statements of pain.

Similarly, the ALJ alluded to a discrepancy between the plaintiff's complaints of pain and Dr. Schachne's notation that the plaintiff mentioned having ridden his bicycle to a pick up some medication.  The plaintiff did state in his June 2012 request for reconsideration that he was no longer to take bicycle rides but it is not clear whether the ALJ also considered evidence in the record that the plaintiff did not have a driver's license, had severe anxiety when riding on public

transportation, and merely used his bicycle to make it to his doctor's appointments. The ALJ never asked the plaintiff how often he rode his bicycle or whether he continued to use it after the time referenced by Dr. Schachne. *Nguyen*, 172 F.3d at 35-36 (where an ALJ found a discrepancy between a plaintiff's alleged inability to remain seated and an admission that he drove, the First Circuit found that the ALJ erred by relying on one statement indicating that the plaintiff drove but failed to ask how much he drove or about his subsequent driving history). Consequently, it is not clear whether the plaintiff's bicycle use should have undermined his credibility where he only admitted to riding a bike on limited occasions to visit with his doctors.

But, it is hard to find fault with the ALJ's determination that the plaintiff's testimony regarding no alcohol use was not credible. The ALJ does not say so explicitly but it appears he recognized the obvious discrepancy between the plaintiff's characterization of his use of alcohol and the evidence in the record unambiguously reflecting a pattern of alcohol abuse.

### iii. It is Premature to Determine Whether the ALJ Erred at Step Five

Based upon the foregoing, the Court does not find it appropriate to consider the plaintiff's third argument, that the ALJ erred at step five in finding that the plaintiff was able to perform other jobs in the economy. As noted above, and assuming the matter is revisited on remand, the ALJ's subsequent findings and conclusions may moot or substantially alter this issue.

## IV.   **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion for an order reversing or remanding the Commissioner GRANTED (Dkt. No. 15); and the Commissioner's motion to affirm be DENIED (Dkt. No. 19). The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court

within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the bases for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of health and Human Services,* 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678, F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466 (1985).


/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: August 30, 2016

37